IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JACK BOB GENTRY, JR.,   )
           )
   Plaintiff,    )
           )
 v.          ) Case No. 07-03168-CV-S-REL-SSA
           )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,    )
           )
   Defendant.   )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred in (1) discrediting his subjective complaints, (2) substituting her own opinions for those of his treating physicians, and (3) failing to consider the combined effects of his impairments. I find that the ALJ properly (1) determined Plaintiff was not entirely credible, (2) evaluated the respective opinions of Dr. Allison and Dr. Baker, and (3) considered the combined effects of Plaintiff's back pain and depression. Therefore, Plaintiff's Motion for Summary Judgment will be denied and the decision of the Commissioner will be affirmed.

**I.  BACKGROUND**

Plaintiff submitted a claim for both Social Security Disability Insurance Benefits and Supplemental Security Income Benefits on January 4, 2005. Plaintiff's alleged disability and inability to work stems back pain, depression/anxiety, and chronic headaches. Plaintiff's application

was denied on March 18, 2005. On November 28, 2006, a video hearing was held before an ALJ. On January 16, 2007, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On April 5, 2007, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)(citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial

2

evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998) (discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988)(discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983)(discussing burden in disability insurance benefits case).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.     Is the claimant performing substantial gainful activity?

3

Yes = not disabled.
No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV. THE RECORD

The record consists of the testimony of Plaintiff, vocational expert George Horne, and the documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**1.    Earnings Record**

Plaintiff's earnings record indicates that he earned the following income:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1977 | $ 120.00 | 1991 | $ 5,009.72 |
| 1978 | 260.00 | 1992 | 9,660.78 |
| 1970 | 687.00 | 1993 | 16,167.87 |
| 1980 | 112.00 | 1994 | 16,529.63 |

4

| | | | |
|---|---|---|---|
| 1981 | 3,280.66 | 1995 | 17,266.11 |
| 1982 | 12,352.62 | 1996 | 19,734.07 |
| 1983 | 7,672.63 | 1997 | 18,489.22 |
| 1984 | 1,494.00 | 1998 | 16,132.06 |
| 1985 | 0.00 | 1999 | 4,011.75 |
| 1986 | 3,656.20 | 2000 | 7,556.83 |
| 1987 | 9,888.39 | 2001 | 722.81 |
| 1988 | 11,314.96 | 2002 | 10,181.44 |
| 1989 | 6,894.00 | 2003 | 0.00 |
| 1990 | 0.00 | 2004 | 1,076.00 |

(Tr. at 40, 45-48, 51).

## 2.     Function Report - Adult

On January 21, 2005, Plaintiff reported that a typical day includes taking a hot bath to soothe his back, then cooling with a cold cloth from the freezer (Tr. at 65).  He feeds his sons breakfast and helps them get ready for school (Tr. at 65-66).  Plaintiff helps his sons with their homework in the evening (Tr. at 66).

Plaintiff stated he could not get a full night of sleep even with medication (Tr. at 66).  His conditions cause him to take longer when dressing (Tr. at 66).  He is not limited in his ability to bathe, care for his hair, shave, feed himself, or use the toilet (Tr. at 66).  He indicated he needs to slow down to avoid getting back spasms (Tr. at 66).  Plaintiff prepares his own meals daily and is able to dust and do laundry (Tr. at 67).  His sister mows the lawn and vacuums (Tr. at 67).  Plaintiff reported shopping on his own one to two times a week for approximately one hour (Tr. at 68).

Plaintiff's hobbies include reading the newspaper and watching television; he engages in these activities three to four hours a day (Tr. at 69).  Since the onset of his conditions, he is no longer able to ride a bike, play basketball or hunt (Tr. at 69).  Plaintiff spends time with his sisters and his sons and did not report difficulty getting along with others (Tr. at 69-70).

Plaintiff stated his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit,

5

kneel, climb stairs, complete tasks, and concentrate (Tr. at 70). He further stated he can walk a quarter of a mile before needing to rest for five minutes (Tr. at 70). He can pay attention for "as long as it takes," finishes what he starts, and is able to follow written and spoken instructions (Tr. at 70). Plaintiff reported getting along well with authority figures and has never been laid off because of problems getting along with others (Tr. at 70-71). His ability to handle stress depends on the situation, and he reported handling changes in routine well; he did not report unusual behavior or fears (Tr. at 71).

Plaintiff was prescribed a back brace on January 15, 2004 (Tr. at 71). He uses the brace when walking, cooking, and riding in a car (Tr. at 71).

**3.    Report of Contact**

A March 15, 2005, Report of Contact states that Plaintiff is on Xanax[1] as needed (Tr. at 54). He takes typically takes one pill once a day, although he occasionally needs two (Tr. at 54). Plaintiff stated the Xanax helps with his depression and anxiety, and that he sleeps better when he takes a pill before bed (Tr. at 54). He reported "relationship problems" but stated he enjoys his kids (Tr. at 54). The report also states Defendant can do all self care, activities of daily living, can follow directions, visit with others, and shop (Tr. at 54). He stated he was unable to work due to physical limitations, not by mental limitations (Tr. at 54).

**4.    Disability Report - Appeal**

On December 5, 2005, Plaintiff stated his condition had not changed since he last completed a disability report (Tr. at 73). He stated his sister helps him prepare food for himself and his two

---

[1]Xanax "is used to treat anxiety disorders, panic disorders, and anxiety caused by depression." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/anxiety-medications/alprazolam/healthwise--d00168a1.html (last visited June 26, 2008).

6

children (Tr. at 76). Additionally, he reported difficulty concentrating when reading the newspaper (Tr. at 76). Plaintiff experienced drowsiness and dizziness in the morning from his medications (Tr. at 76). He received some relief from the April 12, 2005, steroid injection but reported intense, shooting pain down his right leg when bending or walking (Tr. at 77). Plaintiff indicated he has a hard time falling asleep due to pain, which makes him tired (Tr. at 77).

**5.     January 4, 2006, Letter**

On January 4, 2006, Plaintiff's attorney Robert Beezley wrote the Office of Hearings and Appeals (Tr. at 53). In the letter, Mr. Beezley stated Plaintiff had limited work activity after his alleged onset date (Tr. at 53). Plaintiff works approximately fifteen to twenty hours a month from his home answering calls for a property management company; he does not work every month (Tr. at 53).

## B.  SUMMARY OF MEDICAL RECORDS

On July 16, 2002, Plaintiff underwent an initial consultation with James B. Allison, M.D. (Tr. at 127, 268). Plaintiff reported things were going worse and that he was in the process of getting a divorce (Tr. at 127, 268). Plaintiff reported difficulty sleeping (Tr. at 127, 268). He stated he still worked, went to church, and took care of his children (Tr. at 127, 268). Dr. Allison instructed Plaintiff to take Xanax, 1 mg four times daily, rather than twice daily, and to return in three months (Tr. at 127, 268).

Plaintiff presented to the Cox Health Systems Emergency Room on July 23, 2002, with complaints of lower back pain (Tr. at 141-144). Straight leg raises[2] were negative (Tr. at 144).

---

[2]"A positive test results in pain in the sciatic nerve distribution and suggests a disc herniation." See MES Solutions, Straight Leg Raising, *at* http://www.mesgroup.com/glossary/tests.asp (last visited May 16, 2008).

Plaintiff was diagnosed with a lumbar strain and placed on light duty (i.e., no lifting greater than twenty pounds) for seven days (Tr. at 141, 142).

An August 7, 2002 MRI of Plaintiff's lumbar spine revealed a disc bulge asymmetric to the right at L5-S1, which resulted in mild flattening of the right S1 nerve root without evidence of canal or foraminal stenosis[3] (Tr. at 177). There was also a minimal disc bulge at L4-5 without canal or neural foraminal stenosis (Tr. at 177).

On September 19, 2002, Plaintiff saw Thomas B. Corsolini, M.D. (Tr. at 115-116). He reported low back and right leg pain stemming from a work injury in April of 2002 (Tr. at 115). Plaintiff was released back to work without restriction on August 30, 2002, but had already been terminated; he stated he had not found any other work (Tr. at 115). Plaintiff stated he still experienced pain centrally in his lower back that bothered him a lot in the morning; he rarely experienced right leg discomfort (Tr. at 115). Sitting, walking, coughing, and sneezing could be painful; bending was particularly painful (Tr. at 115). Plaintiff rated his pain as an eight on a ten-point scale (Tr. at 115). Dr. Corsoloni noted Plaintiff's affect seemed blunted, but that he did not seem sad (Tr. at 115). Plaintiff had normal posture and walked easily without a limp (Tr. at 115). Physical examination revealed an absence of list or scoloisis (Tr. at 115). Forward bending was 50° with discomfort, and back bending was 20°[4] (Tr. at 115). Straight leg raises were negative (Tr. at 115). Range of motion in Plaintiff's hip was normal and pain-free (Tr. at 115). Lumbar rotation and

---

[3]Foraminal stenosis is the narrowing of the opening between two vertebrae through which nerves pass. See STEDMAN'S MEDICAL DICTIONARY 756, 1832 (28th ed. 2006).

[4]The normal range of motion for forward bending is 75°; normal range of motion for back bending is 30°. See Range of Joint Motion, at http://www.ifafitness.com/stretch/stretch8.htm (last visited June 30, 2008).

8

compression tests[5] were negative; he was able to squat and stand on his toes and heels (Tr. at 115). Muscle stretch reflexes were normal bilaterally at the patellar and Achilles locations (Tr. at 115). Palpation was uncomfortable at the right posterior superior iliac spine (Tr. at 115). A Romberg test was normal,[6] and tandem gait performance was good (Tr. at 115). Dr. Corsolini restricted Plaintiff to lifting twenty pounds (Tr. at 116).

Plaintiff received an epidural injection on September 25, 2002 (Tr. at 114). Dr. Corsolini continued him on light duty (Tr. at 114).

On October 2, 2002, Plaintiff returned to Dr. Corsolini (Tr. at 113). Plaintiff stated he felt improved following the epidural injection, although he still had low back pain in the morning (Tr. at 113). Plaintiff had normal posture and walked easily without a limp (Tr. at 113). Physical examination revealed an absence of list or scoloisis (Tr. at 113). Forward bending was 80° and back bending was 20° (Tr. at 113). Straight leg raises were negative (Tr. at 113). Range of motion in Plaintiff's hip was normal and pain-free (Tr. at 113). Lumbar rotation and compression tests were negative; he was able to squat and stand on his toes and heels (Tr. at 113). Muscle stretch reflexes were normal bilaterally at patellar and Achilles locations (Tr. at 113).

On October 15, 2002, Plaintiff saw Dr. Allison (Tr. at 126, 267). Dr. Allison noted he was "getting along pretty well" (Tr. at 126, 267). Plaintiff was instructed to continue taking Xanax, 1 mg four times a day and to follow up in three months (Tr. at 126, 267).

Plaintiff saw Dr. Corsolini on October 16, 2002 (Tr. at 112). He reported doing well with

---

[5]A positive test indicates pain in the sacroiliac area.

[6]"The Romberg Test is a neurological test to detect poor balance." See All About Multiple Sclerosis, Romberg test, at http://www.mult-sclerosis.org/RombergTest.html (last visited June 30, 2008).

9

occasional low back pain; he did not have significant leg pain (Tr. at 112). Plaintiff had normal posture and walked easily without a limp (Tr. at 112). Physical examination revealed an absence of list or scoloisis (Tr. at 112). Forward bending was 80° and back bending was 20° (Tr. at 112). Straight leg raises were negative (Tr. at 112). Range of motion in Plaintiff's hip was normal and pain-free (Tr. at 112). Lumbar rotation and compression tests were negative; he was able to squat and stand on his toes and heels (Tr. at 112). Muscle stretch reflexes were normal bilaterally at patellar and Achilles locations (Tr. at 112). Dr. Corsolini stated he would release Plaintiff to unrestricted work beginning October 21, 2002 (Tr. at 112).

On November 6, 2002, Dr. Corsolini performed a Final Medical Evaluation (Tr. at 111). He noted Plaintiff had been doing his own physical activity, sometimes raking the yard but usually doing some walking and stretching exercises (Tr. at 111). Plaintiff reported having low back stiffness and soreness in the morning, but has not been bothered by leg pain (Tr. at 111). Plaintiff walked without a limp (Tr. at 111). Physical examination revealed an absence of list or scoloisis (Tr. at 111). Forward bending was 80° and back bending was 20° (Tr. at 111). Straight leg raises were negative (Tr. at 111). Range of motion in Plaintiff's hip was normal and pain-free (Tr. at 111). Lumbar rotation and compression tests were negative; he was able to squat and stand on his toes and heels (Tr. at 111). Muscle stretch reflexes were normal bilaterally at patellar and Achilles locations (Tr. at 111). Romberg test was normal and Plaintiff's tandem gait performance was good (Tr. at 111). Dr. Corsolini opined Plaintiff had reached maximal medical improvement, and stated he would place no restrictions on his ability to work (Tr. at 111).

On December 19, 2002, Plaintiff saw Nurse Practitioner Kendrick with complaints of back pain and numbness in his right leg (Tr. at 175-176, 250-251). He stated the spinal injection did not

help (Tr. at 175, 250).  Plaintiff was given a prescription for Flexeril,[7] Mobic[8] and Vicodin ES,[9] and instructed to rest and apply warm, moist heat to his back (Tr. at 176, 251).

Plaintiff saw Nurse Practitioner Kendrick on January 14, 2003 (Tr. at 173-174, 248-249). He was referred to physical therapy and given a prescription for Vicodin (Tr. at 174, 249).

On January 16, 2003, Plaintiff saw Dr. Allison (Tr. at 125, 266).  Plaintiff continued to take Xanax, 1 mg four times a day (Tr. at 125, 266).  He stated he had slept better since the Xanax was increased from two times a day to four times a day (Tr. at 125, 266).  Dr. Allison noted Plaintiff takes his children to the SMSU basketball games, and planned to take them to the Tournament of Champions that weekend (Tr. at 125, 266).  His sister helped every now and them, and sometimes took the kids on Friday or Saturday (Tr. at 125, 266).

Plaintiff saw Nurse Practitioner Kendrick on February 12, 2003 (Tr. at 169-170, 244-245). Plaintiff stated he started physical therapy yesterday (Tr. at 169, 244). Nurse Practitioner Kendrick discussed Plaintiff's MRI results (Tr. at 169, 244).

On February 20, 2003, Plaintiff saw Dr. Baker at the Doctors Hospital of Springfield for an initial office visit (Tr. at 203-204).  Plaintiff complained of low back pain and stated the pain had been present for nine months (Tr. at 203).  He rated it as an eight on a ten-point scale (Tr. at 203). Plaintiff described the pain as constant and as having an intermittent characteristic of sharp throbbing (Tr. at 203).  The pain was made worse by lifting and relieved by heat and ice, sitting, standing and

---

[7]Flexeril is a muscle relaxant.  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/other-other/cyclobenzaprine/healthwise--d00963a1.html (last visited June 26, 2008).

[8]Mobic is an anti-inflammatory drug.  Yahoo!Health, Drug Guide, *at* http://health. yahoo.com/arthritis-medications/meloxicam/healthwise--d04532a1.html (last visited June 26, 2008).

[9] Vicodin is used to relieve moderate to severe pain.  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/pain-medications/acetaminophen-and-hydrocodone/healthwise--d03428a1.html (last visited June 26, 2008).

laying down (Tr. at 203). He has had physical therapy, injections and pain medication (Tr. at 203). Plaintiff stated the pain was affecting his sleep, employment, emotions and also limited his physical activity (Tr. at 203). Current medications included Mobic, Flexeril and Xanax (Tr. at 203). A MRI of Plaintiff's lumbar spine showed (1) a disk bulge asymmetric to the right at L5-S1 level, resulting in mild flattening of the right S1 nerve root without evidence of canal or foraminal stenosis and (2) a mild disk bulge at L4-5 without canal or neuroforaminal stenosis (Tr. at 204). Physical examination revealed Plaintiff maintained appropriate eye contact; his affect was somewhat blunted (Tr. at 204). Plaintiff demonstrated mild tenderness on palpation at the L4-5 region with radiation out into the gluteal region (Tr. at 204). Straight leg raises were negative (Tr. at 204). Muscle strength appeared adequate (Tr. at 204). Plaintiff was diagnosed with lumbrosacral radiculitis,[10] which seemed to involve primarily the L4 nerve root of his right leg (Tr. at 204). His treatment plan included receiving a lumbar epidural steroid injection (Tr. at 204).

Plaintiff received a lumbar epidural steroid injection on March 11, 2003 (Tr. at 202).

On April 9, 2003, Plaintiff received another lumbar epidural steroid injection (Tr. at 201). He reported 75% improvement in his symptoms for a period of time (Tr. at 201). During an April 10, 2003, visit to Nurse Practitioner Kendrick, Plaintiff reported less back pain (Tr. at 240). Plaintiff also requested and was given refills on Mobic and Flexeril (Tr. at 242-243).

Plaintiff followed up with Dr. Baker on April 30, 2003, after having had an epidural steroid injection (Tr. at 200). He reported experiencing 80% improvement for approximately fifteen days (Tr. at 200). Plaintiff stated he was feeling better and was able to do more work, but still had pain

---

[10]Lumbrosacral radiculitis is a disorder of the nerve roots in the lumbar vertebrae and the sacrum. STEDMAN'S, at 1121, 1622.

with increased activity (Tr. at 200).

On March 20, 2003, Plaintiff requested refills of Mobic and Flexeril (Tr. at 167-168).

Plaintiff followed up with Nurse Practitioner Kendrick on April 10, 2003, concerning his lower back (Tr. at 166).  Nurse Practitioner Kendrick noted Plaintiff had received a lumbar steroid injection from Dr. Baker and was experiencing less pain (Tr. at 166).

Plaintiff received a lumbar epidural steroid injection at L4-L5 on May 8, 2003 (Tr. at 199).  He reported 80% improvement for approximately two weeks from steroid injections (Tr. at 199).  Plaintiff rated his pain as an eight on a ten-point scale (Tr. at 199).

On May 22, 2003, Plaintiff returned to Dr. Baker for a follow-up visit (Tr. at 198).  He reported 80% relief in his symptoms from the epidural steroid injections and rated his pain as a seven on a ten-point scale (Tr. at 198).  Dr. Baker spoke to Plaintiff about the excessive amount of steroids he had been given and informed Plaintiff he needed to wait six weeks before receiving further injections (Tr. at 198).  Until that time, Plaintiff was given a prescription for Norco/Hydrocodone,[11] 10 mg, one tablet during the day and one tablet at night (Tr. at 198).

Plaintiff received a lumbar epidural steroid injection on July 2, 2003 (Tr. at 197).  He reported a 75% improvement in his symptoms from the previous two injections (Tr. at 197).  Because Plaintiff only received temporary relief from these injections, Dr. Baker planned to refer Plaintiff for a surgical consultation (Tr. at 197).

On July 15, 2003, Plaintiff saw Dr. Allison (Tr. at 124, 265).  Plaintiff stated he tried to keep his boys busy; they went bowling and played put-put golf (Tr. at 124, 265).  Dr. Allison noted

---

[11]Norco is a narcotic pain reliever.  See Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/other-other/ narcotic-painkillers/healthwise--zx1135.html (last visited June, 26, 2008).

13

Plaintiff worked in the tower business and did some installation although he still had problems with his back (Tr. at 124, 265). Dr. Allison gave Plaintiff a prescription for Xanax, 1 mg four times a day, and instructed him to return in six months (Tr. at 124, 265).

On July 17, 2003, Plaintiff saw Dr. Baker (Tr. at 196, 265). Plaintiff had received a total of four epidural steroid injections and had limited his physical activity; as such, his back pain had improved (Tr. at 196, 265). Plaintiff rated his pain as a three on a ten-point scale (Tr. at 196, 265).

Plaintiff saw Dr. Baker for medical management on August 19, 2003 (Tr. at 195). He rated his pain as a seven on a ten-point scale (Tr. at 195). Current medications included Flexeril, Mobic, and Norco (Tr. at 195). Dr. Baker maintained Plaintiff on his medications and referred him to Dr. Paul Olive for a surgical consultation (Tt. at 195).

On September 16, 2003, Plaintiff received a lumbar epidural steroid injection (Tr. at 194). He reported 70% improvement in his symptoms following the July 2, 2003, epidural steroid injection, but his pain had returned (Tr. at 194). He rated his pain as an eight on a ten-point scale (Tr. at 194). Plaintiff was also given a prescription for Norco 10/325, one tablet three times daily (Tr. at 194).

Plaintiff saw Dr. Baker for medical management on October 8, 2003 (Tr. at 193). He rated his pain as a seven on a ten-point scale (Tr. at 193). Plaintiff stated he had an epidural steroid injection on September 16, 2003, and had good results for two weeks (Tr. at 193). Dr. Baker refilled Plaintiff's prescription for Norco, one tablet three times a day (Tr. at 193).

On October 30, 2003, Plaintiff saw Dr. Kendrick to receive prescription refills (Tr. at 164-165).

Plaintiff received a selective nerve root block[12] at S1 and his right leg on November 11, 2003 (Tr. at 191-192).

Plaintiff saw Dr. Baker for medical management on December 10, 2003 (Tr. at 190). He reported good results from the selective nerve root block (Tr. at 190). Although he was still experiencing some pain, he thought it was from moving at an odd angle while deer hunting (Tr. at 190).

On January 20, 2004, Plaintiff was seen by Dr. Baker for a selective nerve root block (Tr. at 189). Plaintiff had been seen by Dr. Paul Olive who told him there was not a surgical option; however, he did recommend Plaintiff use a support belt (Tr. at 189). Plaintiff reported he received almost a month's worth of relief from the selective nerve root block in November (Tr. at 189).

Plaintiff saw Dr. Allison on January 30, 2004 (Tr. at 123, 264). He noted Plaintiff continued to do well and was keeping up with his kids (Tr. at 123, 264). Plaintiff's sons were each on at least two teams, so Plaintiff was especially busy on weekends; he also tried to take them to see all the men's Bear games and a lot of the Lady Bear's games (Tr. at 123, 264). Dr. Allison gave Plaintiff a prescription refill for Xanax, 1 mg four times a day, and instructed him to return in six months (Tr. at 123, 264).

Plaintiff saw Dr. Baker on March 17, 2004, for repeat medical management (Tr. at 188). He continued to have pain that was radicular down his right leg, which Dr. Baker believed to be the S1 nerve root (Tr. at 188). Plaintiff rated his pain as an eight on a ten-point scale (Tr. at 188). Dr.

---

[12]Selective nerve root block is a "block that is performed to determine if a specific spinal nerve root is the source of pain and reduce inflammation around the nerve root thus decreasing or relieving the pain." Spine Universe, Selective Nerve Root Block, *at* http://www.spineuniverse.com/displayarticle.php/article346.html (last visited June 30, 2008).

Baker continued Plaintiff on Norco, one table three times a day (Tr. at 188).

On April 15, 2004, Plaintiff underwent a selective nerve root block at S1 (Tr. at 187). Dr. Baker continued him on Norco 10-325, 1 tablet three times a day.

On May 12, 2004, Plaintiff saw Dr. Baker for medical management (Tr. at 186). He continued to have low back pain that radiated down his right leg (Tr. at 186). Dr. Baker noted they would maintain Plaintiff on a Norco tablet three times a day and give him injections every other month (Tr. at 186). Plaintiff's Norco prescription was refilled (Tr. at 186). Dr. Baker did offer a different type of long-acting medication, but Plaintiff stated he was happy with his three tablet a day dose of Norco (Tr. at 186).

Plaintiff saw Dr. Baker on June 10, 2004 (Tr. at 185). He rated his pain as a six on a ten-point scale (Tr. at 185). Dr. Baker noted that Plaintiff had "been treated with various procedures in the past with still no resolution in his symptoms and we will provide him medical management" (Tr. at 185). Plaintiff was on Norco 10/325, 1 tablet three times a day, and appeared to be satisfied with that regimen (Tr. at 185).

On July 8, 2004, Plaintiff received a selective nerve root block S1, right leg (Tr. at 184). He was also given a prescription for Hydrocodone 10/325, one table three times a day (Tr. at 184).

On July 27, 2004, Plaintiff followed up with Dr. Allison (Tr. at 122, 263). Dr. Allison noted plaintiff was doing "pretty good" and was still active with his two boys (Tr. at 122, 263). Plaintiff was given a prescription for Xanax, 1mg four times daily and instructed to return in six months (Tr. at 122, 263).

Plaintiff saw Dr. Baker on August 2, 2004 (Tr. at 183). He stated he had 75% relief from the selective nerve root block (Tr. at 183). Dr. Baker noted Plaintiff was not a candidate for surgery and

could be given a steroid injection every other month due to concerns with over excess steroid (Tr. at 183). Plaintiff was prescribed Norco, 1 tablet three times daily (Tr. at 183).

On September 3, 2004, Plaintiff received a lumbar epidural steroid injection (Tr. at 182). Prior to the injection, he rated his pain as a seven or eight on a ten-point scale (Tr. at 1820. He described more low back pain than right leg pain, stating his right leg was doing well (Tr. at 182).

Plaintiff saw Dr. Baker on September 30, 2004 (Tr. at 181). He stated he experienced 80% relief from his last injection, but had a "little bit of twinge" when he bent down (Tr. at 181). He was instructed not to bend or put any excess strain on his back as it was probable it would heal itself (Tr. at 181). Plaintiff rated his pain as a six on a ten-point scale (Tr. at 181). He was given a refill for Norco, one tablet three times a day for pain (Tr. at 181).

Plaintiff saw Dr. Baker for medical management on November 1, 2004 (Tr. at 156). He was taking Norco, 10 mg, three times a day, and doing relatively well with that (Tr. at 156). The injection he received in August of 2004 also worked relatively well (Tr. at 156). Plaintiff rated his pain as a six or seven on a ten-point scale (Tr. at 156).

On November 30, 2004, Plaintiff saw Dr. Baker (Tr. at 155). He stated his pain had increased somewhat over the past few weeks and that he had responded well to epidural steroid injections (Tr. at 155). Plaintiff rated his pain as a eight on a ten-point scale (Tr. at 155).

Plaintiff returned to Dr. Baker on December 24, 2004 for medical management (Tr. at 153, 154). He stated he got "good relief" from the last epidural steroid injection (Tr. at 153, 154). Plaintiff continued to do well on one tablet of Hydrocodone three times daily, so was continued with that regimen and instructed to return in one month (Tr. at 153, 154).

Plaintiff saw Dr. Baker on January 20, 2005, for continued low back pain and right leg pain

17

(Tr. at 152). His pain level was an eight on a ten-point scale (Tr. at 152). Dr. Baker administered an epidural injection and refilled his prescription for Hydrocodone 10/325, one tablet three times a day (Tr. at 152).

On February 2, 2005, Plaintiff saw Dr. Allison (Tr. at 262). He reported still feeling depressed about losing his father right before Christmas (Tr. at 262). He also reported that he had not had any panic attacks since taking four Xanax a day (Tr. at 262). Plaintiff continued to be very busy caring for his boys, taking them to various sporting events (Tr. at 262). Dr. Allison instructed Plaintiff to continue taking Xanax, 1mg four times daily and to return in six months (Tr. at 262).

Plaintiff was seen by Dr. Baker, on February 17, 2005, for medical management (Tr. at 150). Plaintiff reported doing well after his last injection (Tr. at 150). His pain was a five on a ten-point scale (Tr. at 150). Dr. Baker continued Plaintiff on one tablet of Hydrocodone 10/325 three times daily (Tr. at 150).

Dr. Kenneth Bowles, Ph.D., performed a psychiatric review of Plaintiff on March 16, 2005, in which he opined Plaintiff had non-severe impairment(s) (Tr. at 205-217). Specifically, Dr. Bowles found Plaintiff suffered from depression and anxiety/panic attacks (Tr. at 208, 210). He opined Plaintiff's activities of daily living; social functioning; and ability to maintain concentration, persistence or pace were not limited by either of these impairments (Tr. at 215). Additionally, Plaintiff had not experienced any episodes of decomposition (Tr. at 215).

On July 11, 2005, Plaintiff saw Dr. Baker for medical management (Tr. at 287). Dr. Baker increased his dosage of Hydrocodone from three times a day to four times a day to see if it would produce longer lasting relief (Tr. at 287).

On August 2, 2005, Plaintiff followed up with Dr. Allison (Tr. at 261). Dr. Allison noted

Plaintiff continued to do okay and that he had not had any panic attacks in several months (Tr. at 261). Plaintiff still remained busy taking care of his boys, but would not have to do as much chauffeuring since it was summer (Tr. at 261). Dr. Allison instructed Plaintiff to continue taking Xanax, 1 mg four times daily and to return in six months (Tr. at 261).

On August 9, 2005, Plaintiff saw Dr. Baker for medical management (Tr. at 286). He reported 75% pain relief and assessed his pain as a five on a ten-point scale (Tr. at 286). Dr. Baker continued Plaintiff on Hydrocodone, one tablet four times a day (Tr. at 286).

Plaintiff received a lumbar epidural steroid injection on September 7, 2005 (Tr. at 285). He reported 75% relief with medication; however, on the date of the appointment he assessed his pain as a nine on a ten-point scale (Tr. at 285). Dr. Baker prescribed Plaintiff Hydrocodone, one tablet every six hours as needed (Tr. at 285).

On October 5, 2005, Plaintiff returned to Dr. Baker for medical management (Tr. at 284). He reported 80% relief from the September injection and medications (Tr. at 284). His current pain assessment was three or four on a ten-point scale (Tr. at 284). Dr. Baker instructed Plaintiff to take Hydrocodone, one tablet every six hours as needed (Tr. at 284).

Plaintiff received a lumbar epidural steroid injection on November 7, 2005 (Tr. at 283). He stated he had excellent results from the September injection and estimated seven weeks of good relief (Tr. at 283). In combination with medication, Plaintiff experienced 90% relief (Tr. at 283). Dr. Baker refilled his Hydrocodone prescription (Tr. at 283).

On December 7, 2005, Plaintiff returned to Dr. Baker for medical management (Tr. at 282). He reported 80% relief from his November injection and assessed his current pain level at three (Tr. at 282). Dr. Baker prescribed Plaintiff Hydrocodone 10/325, one tablet four times a day and

19

instructed him to return in thirty days (Tr. at 282).

On January 5, 2006, Plaintiff saw Dr. Allison (Tr. at 260). Dr. Allison noted Plaintiff continued to do very well. Plaintiff was still very active in his children's lives and took them to all of their practices, the Bears' baseball games, and basketball games (Tr. at 260). He was given a prescription refill for Xanax, 1 mg four times daily, and instructed to return in six months (Tr. at 260).

Plaintiff received a lumbar epidural steroid injection on January 6, 2006 (Tr. at 281). He stated experienced seven weeks of 75% relief from the last injection and did quite well (Tr. at 281). Over the past week, the relief had diminished and he had pain at the level of eight on a ten-point scale (Tr. at 281). Plaintiff was given a prescription for Hydrocodone 10/325, one tablet four times a day and instructed to return in thirty days (Tr. at 281).

On February 7, 2006, Plaintiff saw Dr. Baker for medical management (Tr. at 280). He rated his pain as a four on a ten-point scale and estimated he received 80% relief from the injections (Tr. at 280). Dr. Baker noted the Hydrocodone worked well for Plaintiff and maintained his current dosage (Tr. at 280).

Plaintiff returned to see Dr. Baker on March 7, 2006 (Tr. at 279). He rated his pain as an eight on a ten-point scale (Tr. at 279). Plaintiff stated he usually received six to seven weeks of relief following an injection (Tr. at 279). Dr. Baker noted Plaintiff appeared to do well with the injection/medication combination (Tr. at 279). Plaintiff's Hydrocodone prescription was refilled and he was instructed to return in thirty days (Tr. at 279).

On April 5, 2006, Plaintiff returned to Dr. Baker for medical management (Tr. at 278). He reported four weeks of 85% relief and rated his pain as a two or a three on a ten-point scale (Tr. at

278). Dr. Baker noted Plaintiff continued to do well, but continued to have right leg pain that was aggravated by stooping, increased activity, coughing, and sneezing (Tr. at 278). Plaintiff was continued on Norco 10/325, one tablet four times daily (Tr. at 278).

Plaintiff presented to Dr. Baker on May 4, 2006, stating he was still doing well from the March procedure (Tr. at 277). He reported 80% relief with medication and assessed his pain as a four on a ten-point scale (Tr. at 277).

On June 6, 2006, Plaintiff received a lumbar epidural steroid injection at the right side of L3-L4 (Tr. at 276). He stated he sometimes experiences 75% to 80% relief with medication but rated his pain as an eight or nine on a ten-point scale (Tr. at 276). Dr. Baker prescribed Plaintiff Hydrocodone 10/325, one tablet four times a day and instructed him to return in thirty days (Tr. at 276).

Plaintiff followed up with Dr. Baker on July 6, 2006 (Tr. at 275). He reported 100% relief for two weeks and then 75% relief with a combination of the procedure and medication (Tr. at 275). He rated his pain level as a five on a ten-point scale (Tr. at 275). Dr. Baker gave Plaintiff Hydrocodone, 1 tablet every four to six hours as needed for pain (Tr. at 275). Plaintiff stated that such regimen would work well for him (Tr. at 275).

On August 2, 2006, Plaintiff saw Dr. Baker with continued complaints of radicular leg pain (Tr. at 274). He rated his pain as a five on a ten-point scale (Tr. at 274). The pain was stabbing, pins and needles that worsened with stooping, bending and sleeping; it was better with medication and position change (Tr. at 274). Dr. Baker continued Plaintiff on Hydrocodone, one tablet every six hours as needed for pain, and instructed him to return in thirty days (Tr. at 274).

Plaintiff received a lumbar epidural steroid injection on August 29, 2006 (Tr. at 273). He

complained of low back pain and right leg pain, and rated such pain as an eight on a ten-point scale (Tr. at 273).  Following the procedure, Dr. Baker provided Plaintiff with 120 tablets of Hydrocodone, one tablet every six hours as needed for pain, and instructed him to return in thirty days (Tr. at 273).

Plaintiff saw Dr. Allison on October 4, 2006 (Tr. at 259).  His manner and appearance were appropriate (Tr. at 259).  His articulation was good, tone soft, and he did not demonstrate any "tics" (Tr. at 259).  Plaintiff's anxiety level was described as "calm" (Tr. at 259).  Dr. Allison continued Plaintiff's current management and instructed him to return in six months (Tr. at 259).

Dr. Allison completed a Medical Source Statement - Mental on October 25, 2006 (Tr. at 269-271).  He opined that Plaintiff was moderately limited in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Tr. at 269-271).  Plaintiff was markedly limited in the ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted; accept instructions and respond appropriately to criticism from supervisors; and get along with

coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. at 270). Plaintiff was not significantly limited in the ability to be aware of normal hazards and take appropriate precautions (Tr. at 271). Dr. Allison further opined Plaintiff had the capacity to perform the following work-related activities on a sustained basis: understand remember and carry out simple instructions; and make simple work-related decisions (Tr. at 271). He opined Plaintiff did not have the capacity to respond appropriately to supervision or deal with changes in a routine work setting (Tr. at 271). Lastly, Dr. Allison noted that Plaintiff's back injury significantly increased the severity of his anxiety and depressive symptoms (Tr. at 271).

### C. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On March 16, 2005, Disability Counselor Falk completed a Physical Residual Functional Capacity Assessment (Tr. at 79-86). Ms. Falk opined Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, sit approximately six hours in an eight-hour workday, and push and/or pull an unlimited amount (Tr. at 80).

In addition, she opined Plaintiff could occasionally climb a ramp and stairs, balance, stoop, kneel, crouch, and crawl (Tr. at 81). He could never climb a ladder, rope or scaffolds (Tr. at 81). Plaintiff did not have any manipulative, visual or communicative limitations (Tr. at 82-83). He should avoid concentrated exposure to extreme heat and cold, vibration, fumes, odors, dusts, gasses, poor ventilation, and hazards (Tr. at 83). His exposure to wetness, humidity, and noise could be unlimited (Tr. at 83).

### D. SUMMARY OF TESTIMONY

Plaintiff testified during the November 28, 2006, hearing. Vocational expert George Horne

also testified at the request of the ALJ.

### 1.    Plaintiff's Testimony

Plaintiff is divorced and has custody of his two sons (Tr. at 303). He has not had a driver's license since 2003 when he received a DWI (Tr. at 304).

Plaintiff testified that he has suffered from depression on and off for fifteen years (Tr. at 323). He stated his back injury increased his level of depression (Tr. at 324). He estimated he felt depressed 60% to 70% of the time (Tr. at 324). Plaintiff felt his depression was caused by not being able to do certain things for his children and missing his parents (Tr. at 324). His symptoms included feelings of hopelessness, mood swings and having anxiety attacks (Tr. at 324).

Plaintiff receives treatment for his depression and mental emotional problems (Tr. at 308). He sees a nurse practitioner every six months as his psychiatrist was older and experiencing "health issues," and takes Xanax four times daily (Tr. at 308-309). He testified that the Xanax helps "somewhat," as he does not feel as stressed (Tr. at 309). Plaintiff testified he has panic attacks two or three times a month (Tr. at 310) They usually occur in the middle of the night and awaken him; sometimes they carry into the day (Tr. at 309). The panic attacks last approximately thirty minutes to an hour, and cause his heart to beat rapidly (Tr. at 309). He becomes upset and feels like he needs to get out of the house so he can breathe better (Tr. at 309). He also takes more Xanax to try to relieve the panic attacks (Tr. at 309). Plaintiff testified he was unsure what triggered the panic attacks, but possibly "a grey day or hurly nights in the winter time" (Tr. at 310). He believed his panic attacks have remained at the same severity level (Tr. at 310).

Plaintiff also suffers from pain in his lower back, below the belt line on both sides (Tr. at 322). He described the pain as "throbbing and stabbing, pins and needles" and estimated it was

present 75% to 80% of the time (Tr. at 322).  The pain radiates down his right leg (Tr. at 316, 322, 323).  He testified his back pain has remained about the same since 2005 (Tr. at 322).  Plaintiff also has intermittent numbness down the front of his right leg to his toe; he estimated the numbness was present 25% to 30% of the time and would last for twenty to thirty minutes (Tr. at 316, 323).  He testified his doctor believes it is caused by a pinched nerve (Tr. at 316).  Plaintiff stated the pain gets worse as the day goes by (Tr. at 312).  The pain is affected by bending, squatting, stooping, and kneeling (Tr. at 313).   Most of the time, the level of his pain would be a seven on a ten-point scale (Tr. at 323).

With regard to his back condition, Plaintiff testified he receives steroid injections to make the pain more tolerable and reduce the pain level to a four on the ten-point scale (Tr. at 311, 322, 323).  The injections help for approximately four to six weeks, then he relies on medication (Tr. at 311).  Even after receiving injections, Plaintiff stated his activity is restricted and he has "to take it easy for a couple of days" (Tr. at 311).  Plaintiff takes pain medication every day (Tr. at 312).  The medications make him tired but he is unable to sleep at night due to the pain; he stated he was lucky to get four hours of sleep a night  (Tr. at 312).  Plaintiff also testified he has trouble with memory and concentration (Tr. at 318).

Plaintiff underwent physical therapy in 2004 (Tr. at 315).  He tries to do muscle stretching exercises for twenty minutes every day, which relieves the pain a little bit (Tr. at 315).  He stated he also likes to take a hot bath (Tr. at 315).  Plaintiff wears a back brace four or five hours three to five days a week; he usually takes it off for bed (Tr. at 315-316).  He stated his doctor told him not to wear it daily because he would become too dependant on the brace (Tr. at 315).

Plaintiff estimated he could both stand and walk for twenty minutes without taking a break

(Tr. at 314). Walking is easier than standing (Tr. at 314). He can sit for twenty to thirty minutes before needing to either lay down or walk around (Tr. at 314-315). He has difficulty going up and down more than ten to twelve stairs (Tr. at 317). Plaintiff has been told by his doctor that he cannot lift more than sixty pounds; however, Plaintiff does not think he could lift five to ten pounds several times a day (Tr. at 311).

Plaintiff testified that if he were cleaning his house, it would be too difficult to crawl on the bathroom floor, scrub around the toilet and get back up again (Tr. at 313). His sister helps him with housework (Tr. at 313). Plaintiff is able to prepare meals and do laundry (Tr. at 313). His children help him take the laundry out of the dryer and fold it (Tr. at 313). Plaintiff is able to vacuum without breaks for ten to fifteen minutes (Tr. at 314). Because he does not drive, Plaintiff's sister helps him with grocery shopping (Tr. at 317). Plaintiff walks throughout the store, but his sister pushes the cart (Tr. at 317). His sister also helps with the yard work (Tr. at 319-320). Plaintiff is able use the riding mower for five to ten minutes, but cannot rake leaves (Tr. at 320). Plaintiff has a friend who helps him with minor house repairs (Tr. at 319). Plaintiff attends his children's sporting events takes them to others; his sister transports them to the events since Plaintiff cannot drive (Tr. at 317-318, 326). While at the events, Plaintiff has to get up and move around; he testified he cannot sit on bleachers because he needs back support (Tr. at 326).

A typical day for Plaintiff includes laying in the bath and using a cold pack; he lays around four or five times a day for twenty minutes to an hour (Tr. at 320). Plaintiff testified these rests were "pretty necessary" to make it through the day (Tr. at 320-321). He believes tiredness and his medication would prevent him from performing a job that would required him to sit, lift up to ten pounds, and packing or assembling small parts eight hours a day (Tr. at 321). If he were to work,

Case 6:07-cv-03168-REL   Document 16   Filed 07/22/08   Page 26 of 38

Plaintiff estimated he would need to call in sick seven or eight days out of a twenty-day work month (Tr. at 321).

Lastly, Plaintiff testified he has migraine headaches two to three times a week (Tr. at 324-325). The pain is located at the bottom of his forehead and goes all the way back to his neck (Tr. at 325). Plaintiff described the pain as excruciating, and stated the Hydrocodone did not help (Tr. at 325). The headaches last approximately five to six hours, until he goes to bed (Tr. at 325). Plaintiff testified that when he has a headache of this severity he is unable to carry on normal activities (Tr. at 325).

**2. Testimony of Vocational Expert George Horne**

Vocational expert George Horne testified at the request of the ALJ (Tr. at 327-331). The ALJ posed a hypothetical question to the vocational expert, which assumed the following restrictions: unskilled work, with no climbing or working at heights; the ability to occasionally stoop, squat, kneel and crawl; no public contact work (Tr. at 328-329). The vocational expert opined that such an individual could perform light, unskilled work such as a small product assembler, shelving clerk, final assembler, and a general assembler (Tr. at 329). When asked about the absenteeism rate allowed at such jobs, the vocational expert stated that such an individual would be allowed approximately eight days a year (Tr. at 329). The days must be accrued before they could be used and, with unskilled work, there would be a ninety-day probationary period where no absences were permitted (Tr. at 329).

Second, the ALJ assumed an individual with the same restrictions described above, but added a restriction that the individual needed to sit/stand every fifteen to twenty minutes (Tr. at 329). The vocational expert responded that such individual could not sustain competitive employment (Tr. at

330).

The ALJ next added the restriction that such individual needed to lay down or recline four to five times a day for up to an hour (Tr. at 330). The vocational expert responded that such breaks exceeded normal tolerance in the workplace (Tr. at 330).

Finally, the ALJ asked the vocational expert about an individual who could maintain concentration at least thirty percent of the day (Tr. at 330-331). The vocational expert responded that such individual could not maintain pace and productivity on the job (Tr. at 331).

### D. FINDINGS OF THE ALJ

On January 16, 2007, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date (Tr. at 16). At step two, the ALJ found Plaintiff's back pain, depression and chronic headaches were "severe" impairments (Tr. at 16). However, she found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing (Tr. at 16-17). At step four, the ALJ found Plaintiff was unable to perform any past relevant work (Tr. at 19). Finally, the ALJ found there were jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. at 19-20).

### V. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that Plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are

28

inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Id. at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including the plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 at 1322.

## 1.  Prior Work Record

Plaintiff's work history shows he worked fairly consistently, but earned very little over his lifetime. His highest annual earnings occurred in 1996 when he made $19,734.07. His average annual earnings for the twenty-eight years he worked is $7,152.53. However, the record also shows that Plaintiff continued to work, at least part time, after his alleged onset of disability (Tr. at 53, 124). This factor supports the ALJ's credibility determination.

29

## 2.    Daily Activities

Statements contained within the evidence of record support the ALJ's credibility determination, in that Plaintiff's activities of daily living are not reflective of an individual suffering from constant pain, fatigue, and depression.

Plaintiff's activities of daily living are not restricted by his depression and anxiety. He stated in the January 21, 2005, Function Report that he did not have any trouble getting along with others, and that he gets along well with authority figures (Tr. at 69-71). Plaintiff reported on March 15, 2005, that he was unable to work due to physical, but not mental, limitations (Tr. at 54). On March 16, 2005, Dr. Bowles opined Plaintiff's activities of daily living were not limited by his depression and anxiety (Tr. at 215).

The evidence also demonstrates Plaintiff remained active despite his physical impairments. On November 6, 2002, records show he reported raking and mowing the yard (Tr. at 111, 320). He routinely took his children to SMSU sporting events (Tr. at 112,123, 260, 262, 264, 266). I note that Plaintiff's sister drove them to these events not because Plaintiff was prevented from driving by his impairments, but because he did not have a driver's license. On July 15, 2003, he told Dr. Allison he was working in the tower business, bidding jobs, and had done some installations (Tr. at 124, 265). Dr. Baker's December 10, 2003, records indicate Plaintiff had been deer hunting (Tr. at 190). Plaintiff reported in a January 21, 2005, Function Report that he was not limited in the ability to bathe, care for his hair, shave, feed himself or use the toilet (Tr. at 66). He also stated he was able to prepare his own meals daily, dust, do laundry, and shop on his own one to two times a week (Tr. at 67). On March 15, 2005, Plaintiff reported he could do all self care and activities of daily living (Tr. at 54). I, accordingly, find this factor supports the ALJ's credibility determination.

### 3. Duration, Frequency, and Intensity of Symptoms

Plaintiff testified at the hearing that he experienced excruciating headaches two to three times per week (Tr. at 324, 325). However, Plaintiff's medical records do not show he complained of or was treated for headaches by any of his doctors.

At the hearing, Plaintiff also testified he felt depressed 60% -70% of the time (Tr. at 324). He testified he had panic attacks two to three times a month, and that the attacks had remained at the same severity level (Tr. at 310). This evidence is contrary to Plaintiff's medical records that indicate the severity of Plaintiff's panic attacks had, in fact, decreased. On February 2, 2005, Plaintiff told Dr. Allison he had not had any panic attacks since taking four Xanax a day[13] (Tr. at 262). Dr. Allison noted on August 2, 2005 Plaintiff had not had any panic attacks in several months (Tr. at 261). On October 4, 2006, Dr. Allison described Plaintiff's anxiety level as "calm" (Tr. at 259). Moreover, Plaintiff only received psychiatric treatment approximately every six months (Tr. at 308-309), which is inconsistent with an individual who is suffering from frequent and severe symptoms. This factor supports the ALJ's credibility determination.

### 4. Precipitating and Aggravating Factors

Plaintiff reported his pain was aggravated by lifting, bending, stooping, kneeling, increased activity, coughing, sneezing (Tr. at 203, 274, 278, 313). The record supports these allegations, in as much as Plaintiff's doctors restricted him from lifting and bending (See Tr. at 114, 116, 141-142, 181). This factor weighs against the credibility determination.

### 5. Dosage, Effectiveness, and Side Effects of Medication

The medical evidence of record demonstrates that Plaintiff's impairments are largely

---

[13]Plaintiff began taking Xanax four times a day on July 16, 2002 (Tr. at 127, 268).

controlled by medication. "An impairment which can be controlled by treatment or medication is not considered disabling." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). Moreover, the records do not show Plaintiff suffered from serious side effects.

With regard to depression, Plaintiff testified at the hearing that the Xanax helps "somewhat" (Tr. at 309). He also testified that he has panic attacks two or three times a month, and that they have remained at the same severity level (Tr. at 310). This testimony is inconsistent with statements contained in his medical records. On October 15, 2002, Dr. Allison noted Plaintiff was getting along well with Xanax (Tr. at 126-127). Plaintiff reported on January 16, 2003, that he slept better with the Xanax (Tr. at 125, 266). On February 2, 2005, Plaintiff told Dr. Allison he had not had any panic attacks since taking four Xanax a day[14] (Tr. at 262). On March 15, 2005, Plaintiff reported Xanax helped his depression and anxiety and also helped him sleep better (Tr. at 54). Dr. Allison noted on August 2, 2005 Plaintiff had not had any panic attacks in several months (Tr. at 261). Importantly, after Plaintiff was prescribed four Xanax a day, the records do not reflect his dosage was ever increased, which suggests it was producing the desired effect.

With regard to his back pain, Plaintiff consistently reported he experienced less pain and responded well after receiving epidural steroid injections (Tr. at 113, 150,153, 154, 155 166, 181, 183, 197, 198, 199, 200, 201, 275, 276, 277, 278, 280, 281, 282, 283, 284, 285). He also reported good results from the selective nerve root block (Tr. at 189, 190). On May 12, 2004, Plaintiff stated he was happy with his Norco prescription and declined Dr. Baker's offer of a different type of long-acting medication (Tr. at 186). Plaintiff stated he was happy with his medication regimen on June 10, 2004 and July 6, 2006 (Tr. at 185, 275). On both November 1, 2004, and December 24, 2004,

---

[14]Plaintiff began taking Xanax four times a day on July 16, 2002 (Tr. at 127, 268).

Plaintiff reported he was doing well with Norco (Tr. at 153-154, 156). Dr. Baker noted on March 7, 2006, that Plaintiff did well with the injection/medication combination (Tr. at 279). On August 2, 2006, Plaintiff indicated his pain was better with medication (Tr. at 274). This factor supports the ALJ's credibility determination.

6.      **Functional Restrictions**

Plaintiff was never placed on any mental restrictions. On March 16, 2005, Dr. Bowles opined Plaintiff's activities of daily living, social functioning, and ability to maintain concentration were not limited by his depression and anxiety (Tr. at 215). By Plaintiff's own admission, he is not limited in his ability to work by mental limitations (Tr. at 54).

Concerning his physical impairments, Plaintiff testified at the hearing he did not think he could lift five to ten pounds several times a day (Tr. at 311). This allegation is not supported by the medical evidence of record. Although Plaintiff's doctors did restrict him from lifting, the restrictions were neither permanent nor as restrictive. On July 23, 2002, Plaintiff was placed on light duty for seven days (Tr. at 141-142). He was released without restrictions on August 30, 2002 (Tr. at 115). On September 19, 2002, Dr. Corsolini restricted Plaintiff to lifting twenty pounds (Tr. at 116). He continued Plaintiff on light duty until October 21, 2002 (Tr. at 112). Dr. Corsolini noted on November 6, 2002, that Plaintiff had reached maximal medical improvement and placed no restrictions on his ability to work (Tr. at 111). Plaintiff has not been placed on formal restrictions since this time. Notably, even when Plaintiff was restricted he was still permitted to lift at least twice the amount he testified he could lift. Accordingly, this factor supports the ALJ's decision to discredit Plaintiff's subjective complaints.

## B. *CREDIBILITY CONCLUSION*

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints are not entirely credible. Plaintiff's motion for summary judgment on this basis is denied.

## VII. TREATING PHYSICIANS' OPINIONS

Plaintiff contends that the ALJ erred by substituting her own opinion for the medical evidence of record. He specifically argues the ALJ should not have discredited the respective opinions of Dr. Allison and Dr. Baker. The opinion of a treating physician is ordinarily given controlling weight. Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000). However, an ALJ may give a treating physician's opinion less weight if the opinion is inconsistent with "the other substantial evidence in [the] record." Id. (quoting 20 C.F.R. § 404.15827(d)(2)); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002). Treatment notes constitute substantial evidence. Krogmeier, 294 F.3d at 1023; Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). "[A]n ALJ should 'give good reasons' for discounting a treating physician's opinion." Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2002).

## A. Dr. Allison

In this case, the ALJ did "not afford significant weight" to the opinion of Dr. Allison as contained in the October 25, 2006, Medical Source Statement (Tr. at 19). As part of the Medical Source Statement, Dr. Allison opined Plaintiff was moderately limited in the ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; carry out very short and simple instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an

34

ordinary routine without special supervision; make simple work-related decisions; complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Tr. at 269-271). Plaintiff was markedly limited in the ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. at 270). Dr. Allison further opined Plaintiff did not have the capacity to respond appropriately to supervision or deal with changes in a routine work setting (Tr. at 271). Lastly, Dr. Allison noted that Plaintiff's back injury significantly increased the severity of his anxiety and depressive symptoms (Tr. at 271).

> The ALJ provided the following rationale for affording Dr. Allison's opinion less weight,
>
> While Dr. Allison only treated the claimant for his depression and anxiety, he stated that the claimant's disability was based on a back injury. Dr. Allison further stated that the claimant's depression and anxiety became increasingly severe due to his back injury. However, the claimant reported relief from his back pain with steroid injections and pain medications. Additionally, the claimant reported no panic attacks since he began taking Xanax.

(Tr. at 19). I find that this constitutes the requisite "good reason" for discrediting Dr. Allison's opinion. Furthermore, as alluded to by the ALJ, Dr. Allison's treatment notes are inconsistent with the limitations contained in the medical source statement. Dr. Allison's treatment notes reflect

35

Plaintiff was doing well (Tr. at 122, 123, 126, 259, 260, 261, 263, 264, 267). Since Plaintiff's Xanax dosage was increased to four a day on July 16, 2002 (Tr. at 127, 268), he had not experienced panic attacks (Tr. at 261, 262). Plaintiff's Xanax dosage has not been increased since that date. Dr. Bowles also opined that Plaintiff's activities of daily living, social functioning, and ability to maintain concentration, persistence and pace were not limited by his depression and anxiety (Tr. at 215). Additionally, Plaintiff has stated he does not have difficulty getting along with others and does not believe he is limited by his depression and anxiety (Tr. at 54, 69-70, 70-71). I, therefore, conclude that substantial evidence supports the ALJ's evaluation of Dr. Allison's opinion.

### B. Dr. Baker

Plaintiff contends that the ALJ substituted her own opinion for the medical evidence of record when assessing Dr. Baker's records. He argues that pain relief "was short-lived requiring treatments to be given on a regular basis while having no significant long-term benefits" (Doc. No. 11, p. 14).

Importantly, a review of the medical evidence of record reveals that Dr. Baker never opined Plaintiff was disabled. Rather, Plaintiff consistently reported he experienced less pain and responded well after receiving epidural steroid injections (Tr. at 113, 150,153, 154, 155 166, 181, 183, 197, 198, 199, 200, 201, 275, 276, 277, 278, 280, 281, 282, 283, 284, 285). On February 7, 2006, Dr. Baker noted the Hydrocodone worked well for Plaintiff (Tr. at 280). Again on March 7, 2006, Dr. Baker noted Plaintiff appeared to do well with the injection/medication combination (Tr. at 279).

In addition, the objective medical evidence does not support a finding of disability. Straight leg raises were consistently negative (Tr. at 111, 112, 113, 115, 144, 204). Lumbar rotation and compression tests were negative (Tr. at 112, 113, 115). Physical examinations revealed an absence

36

of list or scoloisis (Tr. at 111, 112, 113, 115). Range of motion in Plaintiff's hip was normal (Tr. at 111, 112, 113, 115); Plaintiff only demonstrated mild tenderness on palpation (Tr. at 204). Lumbar rotation and compression tests were negative (Tr. at 111, 112, 113, 115). A MRI showed a disc bulge without evidence of canal or neural foraminal stenosis (Tr. at 177, 204). On November 6, 2002, Dr. Corsolini placed no restrictions on Plaintiff's ability to work (Tr. at 111). Dr. Olive opined Plaintiff was not a surgical candidate (Tr. at 189). Based on this evidence, I find that the ALJ did not substitute her own opinion for the medical evidence of record in deciding Plaintiff was not disabled. Plaintiff's motion for summary judgment is denied on this ground.

## VIII.  COMBINED EFFECT OF IMPAIRMENTS

An ALJ is required to consider the combined effect of all impairments when making a disability determination. 20 C.F.R. §§ 404.1523, 416.923. "Sufficient consideration of the combined effects of a plaintiff's impairments is shown when each is discussed in the ALJ's decision, including discussion of the plaintiff's complaints of pain and level of daily activities." Smith v. Chater, 959 F. Supp. 1142, 1147 (W.D. Mo. 1997); see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). "'To require a more elaborate articulation of the ALJ's thought process would not be reasonable.'" Id. (quoting Gooch v. Secretary of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987)); see also Browning, 958 F.2d at 821.

In this case, Plaintiff maintains that the ALJ failed to consider the combined effects of his impairments. I disagree. The ALJ specifically found Plaintiff's back pain and depression to be severe impairments (Tr. at 16). In her opinion, the ALJ discussed both the back pain and depression (Tr. at 17-19). She evaluated each under the appropriate listing and ultimately declined to find Plaintiff disabled, as both impairments were well controlled by medication and because she did not

Case 6:07-cv-03168-REL   Document 16   Filed 07/22/08   Page 37 of 38

find Plaintiff entirely credible (Tr. at 18-19).  Plaintiff's motion for summary judgment is denied.

## IX.  CONCLUSION

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 22, 2008

Case 6:07-cv-03168-REL   Document 16   Filed 07/22/08   Page 38 of 38